### UNITED STATES DISTRICT COURT
### DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **Comcast of Southern New England, Inc.** | ) | Case No.: **05-cv-10302-DPW** |
| | ) | |
| Plaintiff, | ) | |
| | ) | **MEMORANDUM OF LAW IN SUPPORT** |
| vs. | ) | **OF PLAINTIFF'S MOTION FOR** |
| | ) | **DEFAULT JUDGMENT** |
| **Louis Connor** | ) | |
| | ) | |
| Defendant | ) | |

## 1. Procedural history

The Plaintiff filed a Complaint in this action on February 15, 2005. The Defendant was served, by abode service, with copies of the Complaint, Summons and other pertinent documentation on February 24, 2005. Thereafter, the Defendant failed to appear in this action. On May 11, 2005 Default was entered against the Defendant in this action. Plaintiff, after requesting and receiving a number of extensions has now moved for Default Judgment against the Defendant.

## 2. Analogous Case Law

The Plaintiff has moved forward for Default pursuant to 47 U.S.C. § 553, a provision of Title 47 that prohibits the unauthorized interception of television signals from the cable television system. The telecommunications provisions of the United States Code also contain the provision, 47 U.S.C. § 605, which prohibits the unauthorized utilization of interstate radio-originated communications. Section 605 is extremely similar to 47 U.S.C. § 553.

Both provisions essentially bar the unauthorized interception of television signals. Also, the statutory damage provisions for non-commercial defendants in § 605 and § 553 are extremely similar. In fact, the Second Circuit has held that where there is an unauthorized interception of signals from a coaxial cable, and the signals intercepted from the cable include interstate radio-

originated communications, both §605 and §553 are violated.  See *International Cablevision, Inc. v. Sykes* ("Sykes I"), 997 F. 2d 998, 1007 (2d Cir. 1993); *International Cablevision, Inc. v. Svkes* ("Sykes II"), 75 F.3d 123, 131 n.4 (2d Cir. 1996); but see  *Charter v Burdulis* __ F.Supp.2d __ 2005 WL 984223 (D. Mass 2005) In any event, even if § 605 might not apply for unauthorized cable television violations in the District of Massachusetts the cases decided pursuant to 47 U.S.C. § 605 are, at least, analogous or similar to §553 cases.  Accordingly, the Plaintiff will make citations to § 605 cases simply as persuasive authority.

Also, in some of the cases cited in this Memorandum, the defendants were using black market non-addressable descrambling devices to covertly descramble all of the cable company's signals.  These descrambling devices are often referred to as "black boxes".  In the case at bar, one of the Plaintiff's legitimate converter/descramblers has been covertly modified by the Defendant or his agent to create a non-addressable descrambling device, in essence a home made black box.  This descrambling device was then utilized for the unauthorized interception of the Plaintiff's signals.  Therefore these "black box cases" are analogous to the claims in this Civil Action.  Additionally, the Plaintiff cites to satellite television cases in this Memorandum wherein the defendants utilize satellite de-scrambling devices that are also similarly analogous to the homemade black box utilized by the Defendant in this Civil Action.

## 3.  The Plaintiff's Case without the Default

Even without the Defendant's Default, the Plaintiff still has a strong case against the Defendant.  Possession of a television descrambling device is sufficient evidence from which a trier of fact could infer that the device was used to descramble the Plaintiffs television signals.

See. *DirecTV. v. Miller*, Case no 6:03-cv-1027-Orl-19KRS (a copy of the unpublished case is attached hereto as "**Exhibit A**"). In the Miller case, the plaintiff, DIRECTV, had evidence that the defendant possessed a satellite television descrambling device called an "unlooper". The defendant in the *Miller* case moved for Summary Judgment against DIRECTV contending that DIRECTV lacked the necessary "direct evidence" such as eyewitness testimony or videotape of some wrongdoing and the defendant denied using the "unlooper".  The Court rejected this argument stating:

> A reasonable jury could conclude that the defendant illegally stole DirecTV's programming.  Based on their life experience, a jury could reasonably assume that people only buy electronic equipment such as televisions, computers, or (in the case of Defendant) satellite piracy unloopers when they plan to use such equipment.  It would be a strange world, after all, if people regularly bought such equipment and then put it in the closet to collect dust. *Id* at 7

Moreover, the Defendant's actual possession of a television descrambling device leads to the reasonable inference that the device was used to descramble.  In *Community Television Systems, Inc. v. Caruso*, 134 F. Supp. 2d 455 (D. Conn. 2000), <u>*aff'd*</u>, 224 F.2d 430 (2d Cir. 2002), there was evidence that the defendants purchased and installed cable television de-scramblers that would allow them to illegally view the plaintiff's cable television programming. *Id*. at 456.  Although there was no so-called "direct" evidence that the defendants had ever actually used the devices the court, nonetheless, found the defendants liable for using the devices.   After noting that the defendants had engaged in the transactions of obtaining descrambling devices from a distributor named "Radil" the court said:

> Based on the record here, the most reasonable inference is that each such transaction was engaged in with Radil so the descrambler could be used for its intended purpose, namely to receive cable services over TCI's system; there is no evidence of non-use or any other use.  Thus, the court concludes that each of the named defendants used and benefited financially from the descrambler sold by Radil, commencing in 1992 *Id*. at 460.

The Second Circuit affirmed the pertinent elements of the Connecticut District Court's liability decision in the *Caruso* case. In fact, the Second Circuit stated that the purchase and installation evidence was **"*at least*"** enough evidence for a rebuttable presumption of use. The court said:

> "In the pending case, the seller's computer records showed the names of [the defendants] and the devices were installed in their home. That evidence suffices to create **at least** a rebuttable presumption that each of them is liable." *Community Television Systems, Inc. v. Caruso*, 284 F.3d 430, at 432 (2nd Cir. 2002) ( emphasis added).

Additionally, the Fifth Circuit recently found that where an individual purchased a satellite descrambling device and where that individual had the necessary satellite dish to bring signals into his home unauthorized interception of signals could be inferred. See *DIRECTV Inc. v. Minor* --- F.3d ----, 2005 WL 1870779

**4. Well Pled Facts Deemed Proven Upon Default**

The Default already entered in this action against the Defendant is similar to a finding of liability against the Defendant. See, *Almedia v. Secretary of Health Education of Welfare*, 622 F. 2d 1044 (1st Circuit 1980). Accordingly, based upon the Default that has already entered against the Defendant, the Plaintiff has now proven the liability of the Defendant as to the matters set forth in the Plaintiff's pleadings.

Accordingly, the Plaintiff has proven certain pertinent facts, including but not limited to the facts that:

    a.   The Plaintiff has the legal franchise to sell cable television services in the Defendant's area;

b.  The Plaintiff distributes its cable television services to its subscribers utilizing scrambling technology such that a subscriber will receive descrambled (clear view) signals only for those services the subscriber is authorized to receive;

c.  On or before 2/15/2002  the Defendant or some third party, covertly modified a certain Plaintiff issued decoder and thereby created an illegal, unauthorized descrambling device;

d.  From on or before 2/15/2002, the Defendant utilized an unauthorized descrambling device to receive and/or intercepted the Plaintiff's premium cable channels and pay per view events without authorization and without payment to the Plaintiff; and

e.  The Defendant's unauthorized interception of signals was done knowingly and willfully.

Based upon these facts and others set forth in the Plaintiff's pleadings, the Defendant is now liable to the Plaintiff for willful violations of Title 47 U.S.C. § 553(a).  Specifically, the Defendant's actions violated §553(a)(1), which provides:

**No person shall intercept or receive or assist in intercepting or receiving any communications services offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law.**

## II.    Damages

**1.  Damage Provisions and Remedy Provisions in Title 47 U.S.C. § 553(c)**

Title 47 U.S.C. §553(c) provides civil damages and remedies to an aggrieved party from Defendants who have violated the above referenced §553(a) (1).  Various subsections of § 553 (c) provide:

1.   The Court may grant a final injunction to prevent further violations of §553 (a)(1) pursuant to 47 U.S.C. § 553 (c)(2)(A);

2.   The Court may grant recovery of full costs including awarding reasonable attorney's fees to the aggrieved party who prevails pursuant to 47 U.S.C. 553(c)(2)(C); and

3.   The Court may award actual damages or the Court may, at the Plaintiff's election, award statutory damages in a sum of not less than $250.00 or more than $10,000.00 as the court considers just, pursuant 47 U.S.C. § 553(c)(3)(A)(ii).

4.   The court can increase the statutory damage award by up to $50,000.00 if the violations of §553 (a) were willful and for private financial gain pursuant to 47 U.S.C. § 553(c)(3)(B).

**2.  The Assessment of Statutory Damages**

Although 47 U.S.C. §553(c) provides little guidance on the assessment of statutory damages, courts have used a variety of methods when assessing statutory damages including:

 **(a) Estimating actual damages**, See *Comcast v Naranjo* 303 F. Supp. 2d 43 (D. Mass 2004), *Charter v Burdulis* __ F.Supp.2d __ 2005 WL 984223 (D. Mass 2005) and *Comcast v Doucette* CA NO, 03-11779-REK (D. Mass 2005) (a copy of the unpublished case is attached hereto as "**Exhibit B**");

    **(b) Assessing additional damages, over and above an estimate of actual damages, pursuant to the exemplary damages provision of the statute, 47 U.S.C. § 553(c)(3)(B), based upon the willfulness and private financial gain of the defendant.** See *Charter v Burdulis* __ F.Supp.2d __ 2005 WL 984223 (D. Mass 2005) and *Comcast v Doucette* CA NO, 03-11779-REK (D. Mass 2005), *Cablevision v Lokshin*, 980 F. Supp. 107 (E.D.N.Y. 1997)

    **(c) Assessing additional damages as a form of deterrence,** See *Time Warner v Domsky*, No. 96 Civ 6851, 1997 U.S. Dist. LEXIS 13505 (S.D.N.Y. Sept. 2, 1997) (a copy of the unpublished decision is attached here to as **"Exhibit C"**), *DIRECTV v Getchel* 2004 WL 1202717 (D. Conn. 2004) (a copy of the unpublished decision is attached here to as **"Exhibit D"**) and *Cablevision v Collins* 2004 WL 1490307 (S.D.N.Y. 2004) (a copy of the unpublished decision is attached here to as **"Exhibit E"**).

    .

## 3. The Estimate of Actual Damages

### A. Facts Pertaining to Estimate of Actual Damages

    By Affidavit, the Plaintiff has asserted that:

a.    A particular converter/descrambler, bearing serial number CI59APXFV, was issued to the Defendant on or before December 1999;

b.    Converter/descrambler CI59APXFV was returned to the Plaintiff by the Defendant on February 15, 2002;

c.    Shortly after Converter/descrambler CI59APXFV (hereinafter the "device") was returned to the Plaintiff, it was tested by the Plaintiff. The test proved,

unequivocally, that the device had been modified to allow for the unauthorized interception of all the Plaintiff's premium channels and pay-per-view offerings;

d.  During the period of time the device was in possession of the Defendant he never ordered a single premium channel nor did he order pay-per-view offerings;

e.  Absent other evidence we can infer that the device was used for the unauthorized interception of signals from December 1999 until February 2002; this represents a 26 month period of time.

f.  An individual in possession of a descrambling device would still need to purchase some cable television signals from the Plaintiff in order to allow signals to enter the home and thereafter to be descrambled.

g.  Additionally, the non-premium cable television stations (e.g. MTV, The History Channel, etc.) are offered to subscribers in groupings of channels ("tiers"). These channels are either delivered in groups to the subscriber in a non-scrambled fashion or they are simply not delivered into the home at all. This also explains why an individual with a descrambling device might still be paying a significant amount to the cable television company while utilizing a descrambler to descramble the premium channels. If an individual wanted access to all stations that individual would have to pay to have the non-scrambled stations come into the home and then use the descrambling device to descramble the premium stations and pay-per-view offerings.

h.  During the above referenced 26 month period the pricing for standard service ("tiers") varied significantly but taking into account the length of time and the variations in price it is reasonable to state that Defendant was paying *on*

*average* $8.29 per month for her service from the Plaintiff.  This service did not include any scrambled premium stations.

i.    During the above referenced 26 month period the charge for all of the premium channels that would have been available to the Defendant through the use of the device varied significantly but taking into account the length of time and the variations in price it is reasonable to state that price *on average* was $65.00 per month.  This $65.00 figure represents the value of the premium channels the Defendant had access to over and above the non premium stations she was actually paying for.

j.    During the above referenced 26 month period the charge for and the number of pay per view movie offerings that were accessible to the Defendant through the use of the device varied significantly but taking into account the length of time and the variations in price it is reasonable to state that price *on average* was $3.95 per movie and there were numerous movies offered per month.

k.    During the above referenced 26 month period the charge for and the number of adult pay per view movie offerings that were accessible to the Defendant through the use of the device varied significantly but taking into account the length of time and the variations in price it is reasonable to state that price *on average* was $8.00 per movie and there were numerous movies offered per month.

l.    During the above referenced 26 month period the charge for and the number of special event pay per view offerings (e.g.; boxing or wrestling match) that were accessible to the Defendant through the use of the device varied significantly

but taking into account the length of time and the variations in price it is reasonable to state that price *on average* was $30.00 per special event and, on average there was at least one special event per month.

**B. Estimate utilizing reasonable inference of use method**

In the case of *Comcast v Naranjo* 303 F. Supp. 2d 43 (D. Mass 2004) the Massachusetts Federal District Court estimated damages from the use of the modified converter/descrambler by making reasonable inferences of the amount of use of the device by the Defendant in that case. The Court in the *Naranjo* case found there where an individual had access to a similar descrambling device it was reasonable to infer some unauthorized interception based upon the use of the device. The *Naranjo* court found that it was that it was reasonable to infer that the monthly damages included:

    a. The cost of the premium channels the defendant had unauthorized access to each month ( this is the differential between what a defendant pays for service and the cost of all of the premium channels that they are able to obtain with the descrambling device);

    b. Ten (10) pay-per-view movies each month;

    c. Four (4) of the more expensive pay-per-view offerings.

Applying these numbers to the cost of the services during the pertinent time frame as set forth in the Affidavit of the Plaintiff an estimate of monthly damages based upon reasonable inferences of use would be:

The value of the premium channels received
over and above what the defendant was
paying for basic services                                             $65.00

The value of fourteen pay-per-view movies,               $39.50

| The value of four more expensive pay-per-view events, | $32.00 |
|---|---|
| Total damage per month | $136.50 |

### C.  Estimate of Actual Damages per month utilizing *high-end purchaser* analysis

By Affidavit the Plaintiff has asserted that Comcast did an analysis of its legitimate, paying, legal subscribers in the region as to their pay-per-view purchasing in the month of February, 2003.  This analysis showed that a statistically significant number (.17%) of its legitimate, paying, high-end purchasers purchased fourteen (14) or more pay-per-view movies during that particular month.  Based upon these statistics the plaintiff asserts that if its high-end, legitimate, *paying,* legal customers purchase as many as fourteen or more paper views per month, it is clearly reasonable to infer that an individual like the Defendant who, when utilizing a descrambler (and not paying anything for pay-per-view offerings) would obtain at least as many pay-per-view movies per month as Comcast's legitimate high-end purchasers.

The cost of fourteen pay-per-view movies at the time in question was $55.30.  Adding this amount to the cost of the premium channels made available through the use of the descrambler ($65.00) there would be a reasonable estimate of monthly damages of at least $120.00.  Indeed, the monthly figure for this Defendant should be considerably higher because, while the Plaintiff's analysis dealt with pay-per-view movies, the descrambling device would also allow the Defendant access to the more expensive pay-per-view offerings (e.g. adult offerings or sporting events).  It is reasonable to infer that at least some monthly viewing by the Defendant would be of more expensive pay-per-view offerings.

### D.  Estimate of number of months of unauthorized interception.

The court in the *Naranjo* case found that the estimated duration of the unauthorized interception began at the time when the defendant came into possession of the subject device *and* last ordered a premium channel or pay-per-view advent and concluded as of the date the device was returned to the plaintiff.  In this civil action this Defendant never ordered a premium channel or pay-per-view while this particular converter descrambler was in her possession. From this information we can infer that the box was modified soon after it came into possession of the Defendant in December 1999 and it was utilized until it was returned in February 2002. This represents approximately 26 months of unauthorized interception.

**E. Conclusion as to estimates of actual damages**

Using the above referenced formulas with the numbers supplied by the Plaintiff's employee in his affidavit, the range for the estimate of actual damages runs from $136.50 utilizing the "reasonable inference" formula to $120.30 utilizing the "high-end purchaser" formula.

**4. Assessing additional damages, over and above an estimate of actual damages, pursuant to the exemplary damages provision of the statute, 47 U.S.C. § 553(c)(3)(B),  based upon the willfulness and private financial gain of the defendant.**

In the recent cases of *Charter v Burdulis* 367 F.Supp.2d 16, 2005 (D.Mass 2005) and *Comcast v Doucette* CA NO, 03-11779-REK (D. Mass 2005) the Massachusetts Federal District Court found it could assess additional damages pursuant to 47 U.S.C. § 553(c)(3)(B) if it found the violations of  47 U.S.C. § 553(a) were willful and were for a private financial gain. *Id* at 20.

The court went on to find that it was indeed willful to obtain and utilize a descrambler. *Charter* at 22.

The court in the *Charter* case also found that "An individual's use of a descrambler to obtain cable programming without paying for it constitutes 'private financial gain' within the meaning of the statute, absent usual circumstances not apparently present here." *Charter* at 25. The *Charter* court stated that this reasoning was also followed in the case of *Cablevision v Lokshin*, 980 F. Supp. 107 (E.D.N.Y. 1997).

The *Charter* case was just cited favorably and followed in the case of *Comcast v Doucette* CA NO 03-11779-REK (D. Mass 2005) where the Court assessed additional damages pursuant to 47 U.S.C. § 553(c)(3)(B) where the defendant was using a "homemade black box" as in this Civil Action. Accordingly the Plaintiff asserts that the Defendant's actions in procuring and utilizing a homemade black box to avoid paying cable television bills were willful and intentional and these actions were done to give the Defendant a private financial gain subjecting him to the additional statutory damages pursuant to 47 U.S.C. § 553(c)(3)(B).

**5. Assessing Additional Damages as a form of Deterrence.**

At least three separate cases where courts have *specifically added statutory damages for the purpose of deterrence*. See *Time Warner v Domsky*, No. 96 Civ. 6851, 1997 U.S. Dist. LEXIS 13505 (S.D.N.Y. Sept. 2, 1997), *DIRECTV v Getchel* 2004 WL 1202717 (D. Conn. 2004) and *Cablevision v Collins* 2004 WL 1490307 (S.D.N.Y. 2004).

The court in the *Domsky* case clearly set forth the deterrence reasoning when, after estimating the damage in a manner similar to *Naranjo* it said:

> While I find these amounts reasonably approximate the lost revenue from the use of a pirate box, it would not be sufficient deterrence if the damages payable by a violator were limited to the value of the stolen services. There would be no incentive to cease the violation if the penalty were merely the amount that should have been paid. *Id* at 18

The *Domsky* court then went on to double its estimate of damages as a form of deterrence when assessing the statutory damages.   This reasoning was recently explicitly followed in the *Collins* case where that court also doubled its estimate of damages as a form of deterrence when assessing statutory damages.

The Connecticut Federal District Court recently considered willfulness and deterrence when assessing statutory damages for the unauthorized interception of television signals in the case of *DIRECTV v Getchel,* 2004 WL 1202717 (D. Conn. 2004).  The court in the *Getchel case* cited to the case of *Cable/Home Communications corp. v. Network Productions, Inc.,* 902 F. 2d 829, 852 (11th cir. 1990) for the proposition that "In its broad discretion for determining statutory damages, the district court should consider both the willfulness of the defendant's conduct and the deterrent value of the sanction imposed." *Id* at 3.  The court then went on to assess statutory damages above the statutory minimum finding that the minimum would "have no deterrent effect".  *Id* at 3.

In this civil action, the Defendant has defaulted to the specific allegations that the violations were made in a willful and knowing manner. The converter/descrambler was not modified to obtain unauthorized signals by accident.  Following the line of reasoning set forth in these cases, this court should double its estimate of actual damages or, at a minimum, the court should  make an assessment of damage significant enough to act as a deterrent and to take into account the willfulness of the violation.

### 6. Conclusion as to Statutory Damages

Based upon the statute, the arguments and the case law referenced above, statutory damages in this case could be assessed even higher than the $5,000.00 that is being sought by the Plaintiff.

### III.    Injunctive Relief

Based upon the Defendant's liability as determined by the Default, the Plaintiff is entitled

to injunctive relief against the Defendant pursuant to Title 47 U.S.C. § 553 (c) (2)(A) which provides that the Court:

> "may grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain violations of subsection (a)(1) of this section"

The Plaintiff need not prove irreparable harm for the injunction to issue.  Where express authority for issuance of statutory injunctions is provided by legislative enactment, an injunction may issue without resort to the traditional "equitable" prerequisites so long as liability has been established under the statute.  See *General Instrument Corp. v. Nu-Tek Electronics & Manufacturing, Inc.*, 3F. Supp 2d 602, 607 (E.D.Pa.1998), aff'd 197F.3d 83 (3d Cir.1999).  The terms of the requested injunction are reasonably drafted to thwart any future piracy activities by the Defendant.

### IV.  <u>Attorney's Fees</u>

Pursuant to Title 47 U.S.C. 553(c)(2)(C), the Court should direct the recovery of full costs, including awarding reasonable attorneys fees to an aggrieved party who prevails.  The First Circuit follows the "lodestar" approach when awarding attorney's fees pursuant to a Federal statutory authorization.  See, *Furtado v. Bishop*, 635 F.2d 915, (1st Cir. 1980).  Using the "lodestar" approach, the Court would normally multiply the number of hours worked by a reasonable hourly rate.  Utilizing the "lodestar" approach, the Court would, in essence, multiply the reasonable number of hours worked by a reasonable hourly rate.  Plaintiff's counsel has filed an Affidavit with this court that would justify an attorney's fees award of $683.00.

.

### V.  Post-judgment Interest

The Plaintiff is entitled to post-judgment interest accruing on the Judgment pursuant to

28 U.S.C. §1961. Said statute covers post-judgment interest on civil actions brought to judgment in U.S. District Courts.

### VI.    Costs

The Plaintiff is also entitled to costs incurred in this action pursuant to § 553, specifically:

|   |   |   |
|---|---|---|
| a. | Filing Fee ( including fee for out-of-state attorney): | $250.00 |
| b. | Sheriff's Service Fee: | $47.94 |

**TOTAL COSTS:**                                                **$297.94**

### VII.    Conclusion

Pursuant to all of the above, the Plaintiff is entitled to a default judgment as follows:

1.    $**5,000.00** in statutory damages pursuant to § 553;

2.    Attorney's and paralegal's fees of **$683.00**

3.    Costs of **$297.94**.

4.    The issuance of a permanent injunction pursuant to Title 47 §553 utilizing the following language or language of a similar nature:

> The Court hereby enjoins the Defendant, the Defendant's respective agents, servants, employees, and any person or entity controlled directly or indirectly by the Defendant or acting on the Defendant's behalf from the further modification and/or use of electronic equipment designed for the unauthorized interception of signal in violations of provisions of Title 47;

5.    Post-judgment interest running on the judgment pursuant to 26 U.S.C. § 1961.

Respectfully Submitted for the Plaintiff,
Comcast of Southern New England, Inc.
By Its Attorney,

9/16/2005                                    __/s/ John M. McLaughlin__
Date                                         John M. McLaughlin
                                             **Green Miles Lipton & Fitz-Gibbon LLP**
                                             77 Pleasant Street
                                             P.O. Box 210
                                             Northampton, MA 01061-0210
                                             Telephone:  (413) 586-0865
                                             BBO No. 556328

PB 1589 031688

FILED

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**  7'03 NOV 20  PM 1: 02
**ORLANDO DIVISION**

U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO. FLORIDA

**DIRECTV, INC.,**

      **Plaintiff,**

-vs-                   **Case No.  6:03-cv-1027-Orl-19KRS**

**DALE MILLER,**

      **Defendant.**

---

## ORDER

This case comes before the Court on the following:

1.     Defendant's Motion for Summary Judgment.  Doc. No. 21.

2.     Memorandum in Support of Motion for Summary Judgment.  Doc. No. 22.

3.     Plaintiff DirecTV's Memorandum in Opposition to Defendant Dale

        Miller's Motion for Summary Judgment.  Doc. No. 27.

### Background

Plaintiff DirecTV ("DirecTV") broadcasts a variety of television programming

from its network of satellites.  DirecTV bundles its channels into programming packages

and pay-per-view events so its customers can tailor their subscriptions to suit their own

tastes.  Doc. No. 27, p. 2.  To ensure that only subscribers are able to watch its

programming, DirecTV encrypts its satellite transmissions and requires its customers to

use specialized equipment, including something called an access card, to decode the

signals.  *Id.*  DirecTV continually upgrades its security protocols to exclude unauthorized

viewers, known as pirates.  One strategy is to transmit a special signal, called an

electronic countermeasure, throughout the system which disables unauthorized access

79

cards by instructing them to perform a meaningless operation over and over again in an infinite loop. *Id.* at pp. 3-4.

Pirates, however, work just as assiduously to defeat DirecTV's encryption and electronic countermeasures. Various companies, including Vector Technologies, devised a way to "unloop" disabled access cards and thereby render them useful again for unlawfully decoding DirecTV. *Id.* at p. 4. It is undisputed in the record that Defendant bought two "Vector Super Unloopers" in March 2001 from Vector Technologies. It is further undisputed that these devices have no legitimate use and the purpose for which they were expressly designed is the theft of DirecTV viewing. *Id.* at p. 3.

Defendant does not deny that he purchased the unloopers. He simply avers that he has never illegally intercepted DirecTV. Doc. No. 24, Miller Aff. ¶ 3. He also states that he is a DirecTV subscriber. In support of this latter contention, he attaches to his memorandum a bill from DirecTV indicating that he was a subscriber in at least July and August, 2003.[1] Doc. No. 22, Ex. C.

### Standard of Review

Summary judgment is authorized "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate only in circumstances where "the evidence is such that a reasonable jury could [not] return a verdict for the

---

[1] This bill is labeled Exhibit "C." Exhibits "A" and "B," however, do not appear to exist.

nonmoving party." *Id.* The moving party bears the burden of proving that no genuine

issue of material fact exists. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986).

In determining whether the moving party has satisfied the burden, the court

considers all inferences drawn from the underlying facts in the light most favorable to the

party opposing the motion and resolves all reasonable doubts against the moving party.

*Anderson*, 477 U.S. at 255. The court may not weigh conflicting evidence or weigh the

credibility of the parties. *See Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th

Cir. 1993) (citation omitted). If a reasonable fact finder could draw more than one

inference from the facts, and that inference creates an issue of material fact, then a court

must not grant summary judgment. *Id.* (citation omitted).

**Analysis**

**1.     Overview**

Defendant's motion for summary judgment is premised on his belief that DirecTV

"must provide testimony, a witness, or some scintilla of evidence of **actual illegal**

**interception of the satellite signal**." Doc. No. 22, p. 1 (emphasis in original). He

contends that DirecTV has **"no credible evidence"** to substantiate its allegation that he

pirated its broadcasts. *Id.* at p. 2 (emphasis in original). What Defendant appears to

mean is that DirecTV cannot prevail as a matter of law because it does not have the

testimony of an eyewitness who saw Defendant using his unlooper to watch illegally

intercepted programming. Defendant also points for good measure to a bill from

DirecTV indicating that he paid for a July 2003 subscription and owed for an August

2003 subscription. *Id.*, Ex. C. This is presumably meant to imply that Defendant is a

legitimate customer. As will become evident, however, Defendant's conclusions are grounded in poor reasoning and an erroneous understanding of the law of evidence.

DirecTV, on the other hand, argues that 18 U.S.C. section 2520 imposes civil liability for violations of the criminal provision 18 U.S.C. section 2512, which makes it a crime, *inter alia*, to possess any device whose primary purpose is the unauthorized interception of wire, oral, or electronic communications. Doc. No. 27, pp. 1, 5-8. In support of its argument, DirecTV cites the legislative history of section 2512 as well as *U.S. v. Herring*, 993 F.2d 784 (11th Cir. 1993). *Id.* at pp. 5-8. As will become evident, however, these citations are not only inapposite but irrelevant as well because the Court has already ruled that DirecTV may not recover civilly for a violation of section 2512.

The Court will address the arguments of each party in turn, beginning with DirecTV.

## 2.    Is DirecTV's evidence of a section 2512 violation sufficient to resist summary judgment?

DirecTV's memorandum in opposition to summary judgment focuses exclusively on count three of the complaint, a violation of 18 U.S.C. section 2512. *See* Doc. No. 27, pp. 5-8. DirecTV contends that Defendant's purchase of the unloopers is conclusive proof that he violated section 2512, which criminalizes the possession of piracy equipment, and he is, therefore, civilly liable pursuant to section 2520.

While its reasoning is impeccable, DirecTV overlooks one salient fact: DirecTV's cause of action under section 2512 was dismissed in September, 2003. *See* Doc. No. 17. The only pending claims against Defendant are counts one and two, which DirecTV

neglects to address in any way in its memorandum. Strictly speaking, DirecTV's failure to contest Defendant's motion for summary judgment on counts one and two creates a strong presumption that the requested relief is unopposed. *See* Doc. No. 20, p. 5. (Case Management and Scheduling Order stating "Where no memorandum in opposition has been filed, the Court routinely grants the motion as unopposed."). DirecTV, in other words, has exposed itself to an adverse summary judgment ruling because it has not addressed the issues on point in response to Defendant's motion for summary judgment.

### 3. Could a reasonable jury find for DirecTV?

As mentioned earlier, Defendant contends that he cannot be held liable under counts one and two, which claim that he stole DirecTV's programming in violation of 47 U.S.C. section 605(a) (count one) and 18 U.S.C. section 2511 (count two), because DirecTV has no eyewitness evidence that he ever used his unloopers to intercept satellite transmissions illegally. He cites *DirecTV v. Jacas*, 6:03-cv-800-ORL-31-JGG, which held that a default judgment for illegal interception was improper where DirecTV's evidence consisted of nothing but an inference of interception based on the mere possession of satellite piracy equipment. *See* Doc. No. 22, p. 2. Defendant makes two additional assertions. First, he claims that he is an active DirecTV subscriber, implying, the Court supposes, that he is a legitimate customer, not a signal pirate. *Id.* Second, he contends his "litigation is part of a cynical corporate strategy that is abusing the Federal Court System on a nationwide basis." *Id.*

To begin with, Defendant must understand that there are two types of evidence: direct and circumstantial. Direct evidence consists of evidence which "if believed

immediately establishes the factual matter to be proved by it without the need for inferences." *Merriam-Webster's Dictionary of Law* (1996). Examples of direct evidence include eyewitness testimony or a videotape of some wrongdoing. Circumstantial evidence, on the other hand, tries to prove a primary fact by proving related facts, which if believed support an inference that the primary fact is true. *Id.* Examples of circumstantial evidence include fingerprints or DNA, which, if found at a crime scene, support the inference that the person to whom the fingerprints or DNA belong was at the crime scene. Direct evidence is neither inherently superior to nor inferior to circumstantial evidence. The reliability and persuasiveness of all evidence, whether direct or circumstantial, must be evaluated on a case-by-case basis.

When Defendant states that DirecTV has no evidence that he has illegally intercepted satellite transmissions, what he means to say is that DirecTV has no direct evidence. DirecTV, in other words, does not have eyewitness testimony or videotape evidence of Defendant sitting in his living room watching DirecTV for free. DirecTV does, however, have circumstantial evidence that Defendant pirated its broadcasts: Defendant purchased illegal piracy equipment. His purchases support the inference that he used his illicit equipment to intercept broadcasts illegally. Under Federal Rule of Civil Procedure 56, summary judgment is inappropriate when the Court concludes as a matter of law that a reasonable jury, upon careful consideration of the evidence, could find for the non-movant (which in this case is DirecTV). *See supra*, pp. 2-3, Standard of Review. The relevant question, therefore, is whether a reasonable jury could, on the basis of DirecTV's circumstantial evidence, conclude that Defendant pirated DirecTV's signals.

A reasonable jury could conclude that Defendant illegally stole DirecTV's programming. Based on their life experience, a jury could reasonably assume that people only buy electronic equipment such as televisions, computers, or (in the case of Defendant) satellite piracy unloopers when they plan to use such equipment. It would be a strange world, after all, if people regularly bought such equipment and then put it in the closet to collect dust. With this assumption in mind, a reasonable jury could then reject Defendant's self-serving testimony that he has never pirated satellite signals and conclude instead that he did what normal people do after they buy electronic equipment – they use it.[2]

Defendant's evidence that he is or perhaps was a DirecTV subscriber in good-standing has minuscule probative value. Defendant's bill from DirecTV, which he attached to his memorandum as an exhibit, indicates only that he paid for one month of DirecTV in the summer of 2003 and was being billed for a subsequent month. Defendant apparently hopes to use this circumstantial evidence to support the inference that he has never stolen DirecTV programming because he has paid for at least one month of it. It is self-evident, however, that a single payment to DirecTV a few months ago does not prove in any way that Defendant never used his unloopers, purchased in March 2001, to steal DirecTV broadcasts.[3]

---

[2] To the extent that the *Jacas* opinion concludes that DirecTV's circumstantial evidence is inadequate as a matter of law to support an inference of signal piracy, this Court respectfully disagrees.

[3] Other than to note that casting gratuitous aspersions on the integrity of DirecTV is improper, the Court will ignore Defendant's unsupported conclusion that DirecTV's lawsuit against him is cynical and abusive.

4.    Is summary judgment appropriate?

Summary judgment is inappropriate.  While DirecTV failed to oppose Defendant's motion for summary judgment on the only pending claims and Defendant based his motion on a misunderstanding of the law, the uncontroverted evidence before the Court nonetheless establishes the existence of a disputed question of material fact.  In this case, the Court must look past the substandard memoranda and into the record because it is anathema to justice to resolve a genuine controversy simply by weighing the errors of one party against the errors of another.  Despite the efforts of Plaintiff and Defendant to obfuscate the issue, liability under counts one and two of the complaint depends on the resolution by a jury of a material question of fact: does Defendant's purchase of two unloopers support the inference that he used those pirate access devices to steal DirecTV programming?  The Court, therefore, denies Defendant's motion for summary judgment and instructs the parties, especially counsel for DirecTV, to adhere in the future to a higher standard of professionalism.[4]

---

[4] While it is true that *pro se* parties like Defendant are entitled to lenience from the Court, this is not a license to ignore the duty to research both the facts and the law.  Defendant is reminded that his decision to proceed *pro se* does not mean that the Court steps in on his behalf as legal counsel.

CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment (Doc. No. 21) is **DENIED**.

**DONE** and **ORDERED** in Chambers in Orlando, Florida this _20th_ day of November, 2003.

PATRICIA C. FAWSETT
CHIEF UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party

F I L E   C O P Y

ate Printed: 11/20/2003

otice sent to:

    ____  Dale Miller
          1421 Falconwood Court
          Apopka, FL  32712

          6:03-cv-01027    rdo

    ____  Michael T. Sheridan, Esq.
          Stump, Storey, Callahan & Dietrich, P.A.
          37 N. Orange Ave., Suite 200
          P.O. Box 3388
          Orlando, FL  32802-3388

          6:03-cv-01027    rdo

    ____  Richard Trapp
          Law Office of Richard Trapp
          2518 Edgewater Dr., Suite 4
          Orlando, FL  32804

          6:03-cv-01027    rdo

# UNITED STATES DISTRICT COURT

### MIDDLE DISTRICT OF FLORIDA

**SHERYL L. LOESCH**
CLERK OF COURT
80 NORTH HUGHEY AVENUE
ORLANDO, FLORIDA 32801-2278

www.flmd.uscourts.gov

11/20/03

To:
Michael T. Sheridan
Stump, Storey, Callahan & Dietrich, P.A.
37 N. Orange Ave., Suite 200 P.O. Box 3388
Orlando, FL  32802

Re:    Official Facsimile Transmittal of Court Document

---

Enclosed Court document entered in:

case number:            6:03-cv-01027

instrument number:      29

If after three attempts this fax fails, then we will print this document and mail it to you. For questions, please call:    407-835-4200

Number of pages including cover sheet:  11

This facsimile may contain PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) named above. If you are not the intended recipient of this facsimile, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this facsimile is strictly prohibited. If you have received this facsimile in error, please notify the United States District Court at:    407-835-4200 Thank you for your cooperation.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

———————————————————————
                                                      )
COMCAST OF MASSACHUSETTS I, INC.,                     )
     Plaintiff                                        )
                                                      )
     v.                                               )      CIVIL ACTION
                                                      )      NO. 03-11779-REK
ANDREW DOUCETTE,                                      )
     Defendant                                        )
———————————————————————   )

**Memorandum and Order**
May 18, 2005

**I. Pending Matters**

Pending for decision are matters related to the following filings:

(1) Plaintiff's Motion to Amend Motion for Default Judgment (Docket No. 11), Memorandum in Support of Plaintiff's Motion to Amend Motion for Default Judgment (Docket No. 12), Plaintiff's Amended Motion for Default Judgment (Docket No. 13), Memorandum of Law in Support of Plaintiff's Amended Motion for Default Judgment (Docket No. 14), Exhibit A to Jurczak Affidavit (Docket No. 15) (all filed February 16, 2005).

**II. Background**

Plaintiff Comcast of Massachusetts I, Inc., filed the complaint in this action on September 15, 2003. On December 17, 2003, plaintiff requested notice of default. (Docket No. 6) After entry of default by the Clerk, plaintiff moved for default judgment. (Docket No. 7) (filed April 14, 2004) This court allowed that motion on January 26, 2005, and scheduled a hearing on damages for February 24, 2005. The plaintiff then submitted a motion to amend its

motion for default judgment, requesting damages that were not requested in its original motion

for default judgment.  (Docket Nos. 11, 12, 13, 14) (all filed February 16, 2005)  The plaintiff

also submitted an affidavit from one of its employees on the subject of damages.  (Docket Nos.

13, 15) (both filed February 16, 2005)

Before the hearing, I issued an order relating to a possible change in the

defendant's address.  (Docket No. 16)  I rescheduled the damages hearing to March 30, 2005.  At

the hearing on that date, I concluded that it was appropriate to vacate my earlier order allowing

the plaintiff's motion for default judgment. (Docket No. 18)   I then ordered the plaintiff to mail

copies of the pending motions to a second address that might have been the defendant's residence.

(Id.)  I also ordered the Clerk to mail copies of the notice of entry of default to this second

address. (Id.)  These copies were returned as undeliverable, and the defendant has not responded

in any fashion.

### III. Analysis

I conclude that it is appropriate for me to allow the plaintiff's motion to amend the

motion for default judgment as unopposed.

In Comcast of Massachusetts I, Inc. v. Naranjo, I was faced with a similar motion

for default judgment for an action under this statute.  Id., 303 F. Supp. 2d 43 (D. Mass. 2004).  I

conclude that in this case, as in Naranjo, I should also allow the motion for default judgment and

proceed to calculate damages in the same manner.

In that opinion, I described how to determine statutory damages: "I conclude that I

should award as statutory damages no more than as reasonable an estimate of actual damages as

2

the facts here allow." <u>Id.</u> at 49.  In that case, I based my estimate of actual damages upon the charges associated with a reasonable estimate of viewing by an unauthorized interceptor: enhanced services, 10 pay-per-view movies per month, and 4 premium pay-per-view movies per month.  <u>Id.</u>

As I noted in the hearing on March 30, 2005, the employee's affidavit would be sufficient to establish damages if the defendant did not respond.  Based upon this affidavit, I find the following facts:

(1) The defendant began intercepting cable signals in January 1999.

(2) The defendant stopped intercepting cable signals in September 2000.

(3) The duration of the defendant's unauthorized interception was 21 months.

(4) The defendant paid an average of $38.00 per month for cable service during those 21 months.

(5) The average monthly charge for the premium channels to which the defendant gained access through his unauthorized interception was $68.00.

(6) The average cost for pay-per-view movie offerings during the 21-month period was $3.95 per movie.

(7) The average cost for pay-per-view premium movie offerings during the 21-month period was $8.95 per movie.

Based on the costs in my findings of fact, I conclude that $105.30 per month is a reasonable estimate of damages.  I arrive at this number in the following way.  I subtract the $38 the defendant did pay from the $68 charge for enhanced services.  I then add my estimate of 10 movies per month at $3.95 per movie, or $39.50.  Finally, I add my estimate of 4 premium movies

3

per month at $8.95 per movie, or $35.80.  The per-month damages totals $105.30.  For the entire

21 month period, estimated actual damages totals $2,211.30.

The plaintiff has also requested enhanced damages under the statute.  The plaintiff

relies upon a recent decision by Judge Saylor in this district, <u>Charter Communications</u>

<u>Entertainment I, LLC</u> v. <u>Burdulis</u>, — F. Supp. 2d —, 2005 WL 984223 (D. Mass. 2004).  Judge

Saylor noted varying approaches within the circuit on the question of enhanced damages under

the statute and decided that "[t]o maintain some semblance of consistency with the case law in

this circuit, the Court will adopt the position that a $1,000 enhanced damages penalty is the

presumptively correct amount for single violations by individual subscribers."  <u>Id.</u> at *14.  I find

Judge Saylor's approach persuasive and conclude that an enhanced penalty of $1,000 is warranted

in this case.  This enhancement increases the amount of statutory damages to $3,211.30.

Section 553(c)(2)(C) authorizes this court to "direct the recovery of full costs,

including awarding reasonable attorneys' fees to an aggrieved party who prevails."  <u>Id.</u>  Plaintiff's

counsel avers that the plaintiff is entitled to $199.96 in costs, comprising the $150 filing fee and

$49.96 sheriff's service fee.  I credit these assertions and award the plaintiff $199.96 in costs.

Plaintiff's counsel has also submitted an affidavit itemizing the hours that he and a paralegal

expended upon this case.  I find that the 6.0 hours of attorney time and 5.3 hours of paralegal time

are a reasonable expended number of hours.  I also find that the hourly rates of $200 for attorney

time and $90 for paralegal time are reasonable hourly rates.  I award to plaintiff $1,677 in

reasonable attorneys' fees.

Accordingly, the court finds that the plaintiff is entitled to judgment.

# ORDER

For the foregoing reasons, it is ORDERED

(1) Plaintiff's Motion to Amend Motion for Default Judgment (Docket No. 11) is

ALLOWED.

(2) Plaintiff's Amended Motion for Default Judgment (Docket No. 13) is

ALLOWED.

(3) The Clerk is ORDERED to enter forthwith on a separate document a final

judgment as follows:

For the reasons stated in the Memorandum and Order of this date,
it is ORDERED:

(1) Judgment for plaintiff.

(2) Plaintiff is awarded $3,211.30 in statutory damages, pursuant to
47 U.S.C. §§ 553(c)(3)(A)(ii), (c)(3)(B).

(3) Plaintiff is awarded $199.96 in costs, pursuant to 47 U.S.C.
§ 553(c)(2)(C).

(4) Plaintiff is awarded $1,677 in reasonable attorneys' fees,
pursuant to 47 U.S.C. § 553(c)(2)(C).

(5) Defendant Andrew Doucette is hereby permanently enjoined
from the further modification and/or use of electronic equipment
designed for the unauthorized interception of signal in violation of
provisions of Title 47.

(6) Plaintiff shall receive post-judgment interest on the monetary
awards pursuant to 28 U.S.C. § 1961(a), at the federal judgment
rate applicable on the date of this judgment (3.35%).

_____/s/Robert E. Keeton_____

Robert E. Keeton
Senior United States District Judge

*1997 U.S. Dist. LEXIS 13505, \**

Time Warner Cable of New York City, Plaintiff, - against - Linda Domsky, et al., Defendants.

96 Civ. 6851 (DAB) (RLE)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

1997 U.S. Dist. LEXIS 13505

September 2, 1997, Decided

**DISPOSITION:  [\*1]**  Recommended that this judgment entered for plaintiff in the amount of $ 8,590.24 against Mendez and $ 6,840.24 against Malik.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff cable television company sought damages from defendants individuals under the Communications Act of 1934, as amended, 47 U.S.C.S. §§ 553(a) and 605(a), for intercepting the cable company's signals.

**OVERVIEW:** Defendants were individuals who used pirate boxes to intercept the cable company's scrambled signals. The cable company sued the individuals and won default judgments. The cable company then sought damages under the § 605(a). The court entered judgment for the cable company awarding damages for willful violation of § 605(a) of $ 8,590.24 against one individual and $ 6,840.24 against the other plus attorney's fees. The court found that each individual's use of a pirate box was a single statutory violation. Although these amounts reasonably approximated the cable company's lost revenue from the use of the pirate box, they were not sufficient deterrence to limit the damages to the value of the stolen services. Therefore, the court set the damage award at roughly twice the amount of fees avoided, or $ 250 for each month the pirate box was used.

**OUTCOME:** The court entered judgment entered for the cable television company in the amount of $ 8,590.24 against one individual and $ 6,840.24 against the other individual.

**CORE TERMS:** programming, subscriber, pay-per-view, premium, pirate, channel, converter-decoder, cable television, scrambled, unauthorized, reception, signal, cable, box, subscription, descramble, movies, cable television system, broadcast, television, decoder, tier, recommend, willful, viewing, cable operator, scrambling, addressability, descrambling, intercept

### LexisNexis(R) Headnotes ◆ Hide Headnotes

Civil Procedure > Early Pretrial Judgments > Default > Entry of Default & Default Judgment 🖱️ALL
*HN1* 🔖A default judgment entered on well-pleaded allegations in a complaint establishes a defendant's liability.  More Like This Headnote

Communications Law > Federal Acts > Communications Act 

*HN2* 47 U.S.C.S. § 553(a) provides, in pertinent part: No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law. *More Like This Headnote*

Communications Law > Federal Acts > Communications Act 

*HN3* 47 U.S.C.S. § 553(b) prescribes criminal penalties for willful violations, and 47 U.S.C.S. § 553(c) creates a civil cause of action for any person aggrieved by any violation of 47 U.S.C.S. § 553(a)(1). Civil remedies include injunctive relief, damages, costs and attorney's fees. 47 U.S.C.S. § 553(c)(2). As to damages, the party aggrieved may prove actual damages as specified in 47 U.S.C.S. § 553(c)(3)(A)(i), or may elect to receive, under 47 U.S.C.S. § 553(c)(3)(A)(ii), statutory damages for all violations involved in the action, in a sum of not less than $ 250 or more than $ 10,000 as the court considers just. Whichever method of computation of damages is chosen, the amount awarded may be increased if plaintiff proves willfulness or decreased if defendant proves innocence. 47 U.S.C.S. §§ 553(c)(3)(B) and (C). *More Like This Headnote*

Communications Law > Related Legal Issues > Theft of Service 

*HN4* 47 U.S.C.S. § 605(a) provides, in pertinent part: No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. *More Like This Headnote*

Communications Law > Federal Acts > Communications Act 

*HN5* 47 U.S.C.S. § 605(e)(1) and (2) prescribe criminal penalties, and 47 U.S.C.S. § 605(e)(3) creates a civil right of action for persons aggrieved. Civil remedies include injunctive relief, costs and attorney's fees, 47 U.S.C.S. § 605(e)(3)(B)(i) and (iii); and either actual damages, 47 U.S.C.S. § 605(e)(3)(C)(i)(I), or an award of statutory damages for each violation in a sum of not less than $ 1,000 or more than $ 10,000, 47 U.S.C.S. § 605(e)(3)(C)(i)(II). In provisions that correspond to 47 U.S.C.S. § 553(c)(3)(B) and (C), the amount awarded under 47 U.S.C.S. § 605 may be increased if plaintiff proves willfulness or decreased if defendant proves innocence. 47 U.S.C.S. §§ 605(e)(3)(C)(ii) and (iii). *More Like This Headnote*

Communications Law > Federal Acts > Communications Act 

*HN6* Where programming is broadcast via orbiting satellites, it is therefore protected under 47 U.S.C.S. § 605(a) as radio communications, and unauthorized reception is a violation of § 605(a), which prohibits the unauthorized reception of protected radio communications, as well as 47 U.S.C.S. § 553 (a)(1), which protects all communication by cable systems. A cable operator can be a person aggrieved within the meaning of 47 U.S.C.S. §§ 553(c)(1) and 605(e)(3)(A). *More Like This Headnote*

Communications Law > Federal Acts > Communications Act

**HN7** When a court determines that a defendant's conduct has violated the Communication Act of 1934, 47 U.S.C.S. §§ 605 and 553, a plaintiff may recover damages only under one of those sections. An aggrieved cable operator is entitled to elect to recover damages under 47 U.S.C.S. § 605 in consideration of § 605's higher damages awards. More Like This Headnote

**COUNSEL:** For TIME WARNER CABLE OF NEW YORK CITY, plaintiff: Daniel John Lefkowitz, Law Offices of Daniel J. Lefkowitz, Jericho, NY.

For ROBERT METZLER, defendant: Maureen Michele Finn, RESID., NY, NY.

For LUIS MONTALVO, defendant: Mary E. Sheridan, Matthew F. Cooper, Esq., New York, NY.

DANI ORTOLANO, counter-claimant, Pro se, New York, NY.

For TIME WARNER CABLE OF NEW YORK CITY, counter-defendant: Daniel John Lefkowitz, Law Offices of Daniel J. Lefkowitz, Jericho, NY.

**JUDGES:** Honorable Ronald L. Ellis, United States Magistrate Judge. HONORABLE DEBORAH A. BATTS, U.S.D.J.

**OPINIONBY:** Ronald L. Ellis

**OPINION: REPORT AND RECOMMENDATION**

**To the HONORABLE DEBORAH A. BATTS, U.S.D.J.:**

**I. INTRODUCTION**

This is an action by a cable television system operator against twenty-one individuals for unauthorized interception and viewing of plaintiff's "scrambled" cable-borne television signals by means of an illegal decoder device. On February 10, 1997, default judgments were entered against Sigfredo Mendez and Jackie Malik, the two defendants who are the subject **[*2]** of this Report and Recommendation. The matter was referred to the undersigned for an inquest on damages. Plaintiff seeks damages pursuant to the Communications Act of 1934, as amended, 47 U.S.C. §§ 553(a) and 605(a). For the reasons stated below, I recommend that judgment be entered for plaintiff in the amount of $ 8,590.24 against Mendez and $ 6,840.24 against Malik.

**II. BACKGROUND**

Time Warner Cable of New York City ("TWCNYC") is a cable television operator which has been awarded franchises by New York City. Affidavit of Thomas Allen, dated March 9, 1997, submitted in support of inquest for damages ("Allen Aff."), at P 2. Pursuant to these franchises, TWCNYC is authorized to construct, operate and maintain cable television programming in New York, Kings, and Queens Counties. **Id**. TWCNYC programming consists of various tiers of cable television programming and

different individual programming channels. **Id**. at P 3. The "Broadcast Basic" and "Standard" service tiers, for example, are levels of cable television programming service which an individual can subscribe to at a monthly rate which allows a subscriber to receive a package of different programming channels, **[*3]** such as CNN, A&E and MTV, but does not include any "premium" or pay-per-view programming. **Id**. at P 3.

TWCNYC subscribers may elect to subscribe to one or more "premium" programming services such as Cinemax, Home Box Office and Showtime, for an additional monthly charge per service. **Id**. at P 4. TWCNYC also offers pay-per-view programming, which is a service enabling a subscriber to purchase individual movies, sporting events, or other entertainment for a per-event fee over and above the subscriber's regular monthly fee. **Id**. at P 5. Each subscriber is entitled to receive only the level of programming and services which he or she selects and pays for. **Id**. at P 6.

TWCNYC receives the signals to all of its premium and most of its pay-per-view programming channels by transmissions received via orbiting satellites from the producers of such programming. **Id**. at P 7. TWCNYC's premium and pay-per-view programming is protected from unauthorized reception during its transmission to TWCNYC's satellite reception facilities, known as the cable "head-end." **Id**. The signals for all of TWCNYC's cable television services are transmitted from **[*4]** TWCNYC reception facilities to subscribers' residences through a network of cable wiring and equipment (the "System"). TWCNYC retransmits or "cablecasts" the signals to its premium and pay-per-view programming, along with all other programming offered by TWCNYC, in a simultaneous data stream to subscribers over its cable television system. **Id**.

For a subscriber to receive these transmitted cable television signals on his or her television set, TWCNYC provides each subscriber with a device known as a "converter," which converts the multiple signals simultaneously transmitted over the System into different "channels," which can be viewed on a subscriber's television set. **Id**. at P 8. To prevent subscribers from receiving programming services for which they have not paid, TWCNYC encodes or "scrambles" the signals to all of its premium and pay-per-view programming services. **Id**. at P 9. "Scrambling" is a principal security measure used by TWCNYC and other cable operators to protect their programming services against unauthorized reception of service. **Id**. Subscribers purchasing scrambled channel options are provided with a device known as a "descrambler" **[*5]** or "decoder," which is incorporated into a converter. **Id**. The decoder descrambles the encrypted programming which is purchased by a subscriber so that the purchased programming can be viewed clearly on a subscriber's television set. **Id**. Programming not purchased will continue to be scrambled and, therefore, will be unviewable on the subscriber's television set. **Id**.

TWCNYC separately authorizes, either by a technical modification or by a computer command, each of the converter-decoders provided to its subscribers to descramble only those scrambled programming channels which the respective subscriber has selected and purchased. **Id**. at P 10. The converter-decoders which TWCNYC provides to its subscribers have the technology feature and function known as "addressability." **Id**. Addressability is a communication link between a cable operator's central computer and the descrambling and computer circuitry in each converter-decoder provided to its subscribers. **Id**. Addressability enables a cable operator to send a signal command to the converter-decoders assigned to those subscribers who have purchased a pay-per-view program. **[*6] Id**. The signal

command instructs the converter-decoder assigned to those subscribers to descramble the particular pay-per-view program which has been purchased. **Id**. When the pay-per-view program is over, another command is sent for those converter-decoders to resume scrambling pay-per-view programming. **Id**. This procedure limits a subscriber's authorized reception of pay-per-view programming to only those programs which have been purchased. **Id**. Addressability also enables a cable operator to upgrade or downgrade their subscribers' authorized levels of service without having to mechanically alter or physically replace a converter-decoder by way of a service call to a subscriber's residence. **Id**.

TWCNYC's contract agreements with its subscribers forbid unauthorized tampering with TWCNYC's equipment and the unauthorized reception of programming services. **Id**. at P 12. It is possible, however, for an individual to install a modified or "pirate" converter-decoder onto TWCNYC's cable system in place of TWCNYC's authorized converter-decoder. **Id**. "Pirate" devices enable reception of all of TWCNYC's scrambled programming, including **[*7]** all premium and pay-per-view channels, without the subscriber paying for such programming. **Id**. In most cases, TWCNYC cannot detect or prevent the theft of its programming services from "pirate" converter-decoders without affirmative permission from a subscriber to conduct an on-site inspection. **Id**.

TWCNYC's claims against defendants Malik and Mendez arose after TWCNYC recovered the records of the business known as Freedom Electronics of Fort Lauderdale, Florida ("Freedom"). **Id**. at P 13. TWCNYC instituted litigation against Freedom for its sale and distribution of "pirate" converter-decoders which Freedom knew and intended would be used to intercept and descramble TWCNYC's scrambled premium, pay-per-view and other programming service without TWCNYC's authorization. **Id**. Freedom's business records included sales invoices of "pirate" converter-decoders which Freedom sold and shipped to TWCNYC subscribers. **Id**. TWCNYC's complaint against the two defendants in default, Jackie Malik and Sigfredo Mendez, alleges that these individuals intercepted and received TWCNYC's premium and pay-per-view programming without TWCNYC's authorization by the **[*8]** use of "pirate" converter-decoders purchased from Freedom. **Id.**

## A. Sigfredo Mendez

The sales records of Freedom indicate that on February 9, 1994, Mendez purchased a "Base Band Epoxy Cube," which was shipped to his residence in New York County. **Id**. at P 14. A Base Band Epoxy Cube is a "pirate" cable descrambling device which is manufactured only by "pirate" vendors such as Freedom and is not used by any franchised cable television operator. **Id**. The sole function of this device is to enable its user to descramble cable television broadcasts, and it has no legitimate (non-theft related) purpose on a cable television system. **Id**. This device is specifically designed to defeat the type of scrambling technology used by TWCNYC on its cable television system in lower Manhattan, where Mendez resides, thereby enabling Mendez to have unauthorized access to all of TWCNYC's scrambled premium and pay-per-view programming. **Id**.

From April 16, 1987, to the present, Mendez has been a residential subscriber to TWCNYC's cable television service at his residence. On February 9, 1994, the date he purchased the "pirate" box, Mendez subscribed to TWCNYC's **[*9]** "Standard" service tier and had purchased a subscription to two premium channels, Cinemax and Showtime. **Id**. On February 28, 1994, Mendez downgraded and canceled his

subscription to Cinemax and Showtime to just Standard service. **Id**. Later, on April 13, 1995, Mendez canceled his subscription to Standard service and ordered TWCNYC's "Broadcast Basic" service tier. **Id**. Mendez has not purchased any pay-per-view programming since February 9, 1994. **Id.**

## B. Jackie Malik

The sales records of Freedom indicate that on September 9, 1994, Malik purchased a "97.5 Cube," which was shipped to her residence in New York County. **Id**. at P 16. This device is another type of "pirate" cable descrambling device which is manufactured only by "pirate" vendors and is not used by any franchised cable television operator. **Id**. The sole function of this device is to enable its user to descramble cable television programming services such as premium and pay-per-view channels, and it has no legitimate (non-theft related) purpose on a cable television system. **Id**. This device is specifically designed to defeat the type of scrambling technology used **[*10]** by TWCNYC on its cable television system in lower Manhattan, where Malik resides, thereby enabling Malik to have unauthorized access to all of TWCNYC's scrambled premium and pay-per-view programming. **Id**.

From August 30, 1994 to the present, Malik has been a residential subscriber to TWCNYC's cable television service at her residence. **Id**. at P 17. On September 9, 1994, the date of Malik's purchase of a descrambling cube, Malik subscribed to TWCNYC's "Standard" service tier. **Id**. Between September 9, 1994 and the institution of this action, Malik did not purchase any premium or pay-per-view channels and her subscription to Standard service was constant and unchanged. **Id**.

By use of the "pirate" devices purchased from Freedom, defendants Mendez and Malik had access to all of TWCNYC's scrambled premium channels and had constant, round-the-clock reception to pay-per-view programming services without having to pay for such programming. **Id**. at P 18.

TWCNYC's Standard service carries a subscription rate of approximately $ 30 per month. **Id**. at 8 n.2. A subscription to all of TWCNYC's premium channels costs approximately $ 70 per month. **[*11] Id**. Pay-per-view movies cost approximately $ 4 per event, while some pay-per-view special events, such as championship boxing matches, can cost as much as $ 40. **Id**. Although it is not possible to know exactly how many programs were intercepted by defendants, they could have viewed hundreds of dollars worth of programming each month.

## III. DISCUSSION

The defendants have failed to appear or defend in this action and have been adjudged in default by the order entered by Judge Batts. *HN1* "[A] default judgment entered on well-pleaded allegations in a complaint establishes a defendant's liability." **Bambu Sales, Inc. v. Ozak Trading, Inc.**, 58 F.3d 849, 854 (2d Cir. 1995) (quoting **Trans World Airlines, Inc. v. Hughes**, 449 F.2d 51, 63 (2d Cir. 1971), *rev'd on other grounds*, 409 U.S. 363, 34 L. Ed. 2d 577, 93 S. Ct. 647(1973).

Plaintiff was directed by the undersigned to submit affidavits and any other documentation in support of its request for damages. Plaintiff argues that each month of unauthorized service is a separate statutory violation and seeks maximum statutory damages of $ 10,000 under 47 U.S.C. § 605 for each of the claimed **[*12]** violations.

## A. Statutory Framework

*HN2* Section 553(a) of title 47 of the United States Code provides, in pertinent part: No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law.

*HN3* Subsection (b) prescribes criminal penalties for willful violations, and subsection (c) creates a civil cause of action for "any person aggrieved by any violation of subsection (a)(1)." Civil remedies include injunctive relief, damages, costs and attorney's fees. 47 U.S.C. § 553(c)(2). As to damages, the party aggrieved may prove "actual damages" as specified in subsection (c)(3)(A)(i), or, as plaintiff has done here, may elect to receive, under subsection (c)(3)(A)(ii), "statutory damages for all violations involved in the action, in a sum of not less than $ 250 or more than $ 10,000 as the court considers just." Whichever method of computation of damages is chosen, the amount awarded may be increased if plaintiff proves willfulness or decreased if defendant proves innocence. 47 U.S.C. §§ 553(c)(3)(B) **[*13]** and (C).

*HN4* Section 605(a) of title 47 of the United States Code provides, in pertinent part: No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person.

47 U.S.C. § 605(a). *HN5* Subsections (e)(1) and (2) prescribe criminal penalties, and subsection (e)(3) creates a civil right of action for "person[s] aggrieved." 47 U.S.C. § 605(e)(3)(A). Civil remedies include injunctive relief, costs and attorney's fees, § 605(e)(3)(B)(i) and (iii); and either "actual damages," § 605(e)(3)(C)(i)(I), or "an award of statutory damages for each violation . . . in a sum of not less than $ 1,000 or more than $ 10,000 . . . ," § 605(e)(3)(C)(i)(II). In provisions that correspond to § 553(c)(3)(B) and (C), the amount awarded under § 605 may be increased if plaintiff proves willfulness or decreased if defendant proves innocence. §§ 605(e)(3)(C)(ii) and (iii).

## B. Defendants' Liability

TWCNYC's *HN6* programming is broadcast via orbiting satellites and is therefore protected under 47 U.S.C. § 605(a) as radio communications, **[*14]** and defendants' unauthorized reception is a violation of 47 U.S.C. § 605(a), which prohibits the unauthorized reception of protected radio communications, as well as § 553 (a)(1), which protects all communication by cable systems. **International Cablevision, Inc. v. Sykes**, 75 F.3d 123, 133 (2d Cir. 1996) **("Sykes II"); Time Warner Cable of New York City v. U.S. Cable T.V., Inc.**, 920 F. Supp. 321, 328-29 (E.D.N.Y. 1996). TWCNYC is a "person aggrieved" within the meaning of 47 U.S.C. §§ 553(c)(1) and 605(e)(3)(A).

*HN7* When a court determines that a defendant's conduct has violated both § 605 and § 553 of the Communications Act, a plaintiff may recover damages only under one of those sections. **American Cablevision of Queens v. McGinn**, 817 F. Supp. 317, 320 (E.D.N.Y. 1993). An aggrieved cable operator is entitled to elect to recover

damages under § 605 in consideration of § 605's higher damages awards. **International Cablevision, Inc. v. Sykes**, 997 F.2d 998, 1007 (2d Cir. 1993); **Sykes II**, 75 F.3d at 127.

TWCNYC has elected to recover money damages against each defendant in the form of statutory damages as opposed to actual damages, and **[*15]** seeks enhancement for willful violations. Because this case resulted in a default judgment, there is no evidence to contest the finding of willful violation. Defendants, however, could not have believed that they were legitimately entitled to descramble the broadcasts using the pirate boxes. These were willful violations. Plaintiff is entitled to some enhancement of the damages award. Although there is no proof that defendants profited from the use of the illegal boxes, such use did deprive plaintiff of significant income. The enhancement of damages for willfulness should, therefore, take into account the duration of the violation.

## C. Calculation of Damages

TWCNYC argues that each month in which the pirate device was used by one of the defendants constitutes a separate violation because each month represents a separate billing cycle in which the defendants failed to purchase programming. In addition, TWCNYC asserts that the violations were willful and justify awarding damages at the highest level. TWCNYC thus seeks the maximum statutory damages of $ 10,000 for each month for which the device was connected. Defendant Mendez used his device for a period of thirty-one (31) **[*16]** months and defendant Malik for a period of twenty-four (24) months. This results in damage requests of $ 310,000 and $ 240,000 against Mendez and Malik, respectively.

The court disagrees with plaintiff that each month should be considered a separate statutory violation. In this case, the violation is the use of a pirate box to intercept TWCNYC's scrambled cable broadcasts. While the interpretation suggested by TWCNYC would maximize the damages and, therefore, the deterrence effect, the statutory language more strongly supports the conclusion that there was one violation in this case, although of varying duration for each defendant. Indeed, if the court were to follow the plaintiff's reasoning, there would be a violation for each pay-per-view telecast. Each pay-per-view program requires a separate authorization from plaintiff and would therefore be considered a separate violation under plaintiff's analysis. I find that each defendant's use of a pirate decoder constitutes a single statutory violation.

According to plaintiff, its Basic service costs approximately $ 30 per month while subscription to all premium channels costs approximately $ 70 per month. The plaintiff thus potentially **[*17]** loses $ 40 per month when a pirate box allows a user to receive scrambled channels. In addition, the plaintiff provides multiple pay-per-view events, movies, and special events each month. Pay-per-view movies cost approximately $ 4 per viewing, and special events, such as boxing matches, may cost as much as $ 40 per broadcast. While it is not possible to know how many movies the defendants would have viewed illegally, more than a dozen movies are available each month. The viewing of ten to twelve movies at $ 4 per movie and one premium event at $ 40 would result in an additional loss to plaintiff of approximately $ 80 to $ 88 per month. n1 Adding this amount to the $ 40 lost on premium programming, the total loss to plaintiff would be approximately $ 120 to $ 128 per month.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - -

n1 These decoders were used in private residences. While in theory defendants could have viewed every pay-per view offering each time it was broadcast, I have attempted to make a reasonable assessment of actual use by a private violator as opposed to a commercial violator. Time and taste would limit the actual viewing by defendants.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - - **[\*18]**

While I find that these amounts reasonably approximate the lost revenue from the use of a pirate box, it would not be sufficient deterrence if the damages payable by a violator were limited to the value of the stolen services. There would be no incentive to cease the violation if the penalty were merely the amount that should have been paid. The statute recognizes this fact in setting a minimum damage award of $ 1,000. I find that the damage award should be roughly equivalent to twice the amount of fees avoided, or approximately $ 250 per month.

Defendant Mendez began using his pirate box on or about February 1994 and defendant Malik began using his box in September 1994. The complaint was filed in September 1996. Mendez thus deprived TWCNYC of thirty-one (31) months of payments and Mendez, twenty-four (24) months. At $ 250 per month, Mendez shall be liable for damages of $ 7,750 and Malik for damages of $ 6,000.

## C. Attorney's Fees

Plaintiff has submitted an affidavit by William B. Jung indicating the tasks performed, the hours spent, and the rate requested. I have examined the supporting documentation and conclude that plaintiff's attorney's fees and disbursements were reasonable **[\*19]** and adequately documented. Plaintiff seeks a total award of $ 1,680.48, divided equally between the two defendants. I therefore recommend that TWCNYC be awarded $ 840.24 against each defendant.

## III. CONCLUSION

For willful violation of § 605(a), I recommend that defendant Mendez pay statutory damages of $ 7,750, plus costs and attorney's fees of $ 840.24, for a total of $ 8,590.24. For willful violation of § 605(a), I recommend that defendant Malik pay statutory damages of $ 6,000, plus costs and attorney's fees of $ 840.24, for a total of $ 6,840.24. Judgment should be entered accordingly.

Pursuant to Rule 72, Federal Rules of Civil Procedure, the parties shall have ten (10) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable Deborah A. Batts, 500 Pearl Street, Room 2510, and to the chambers of the undersigned, Room 1970. Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal **[\*20]** to the United States Court of Appeals. **See Thomas v. Arn**, 474 U.S. 140, 150, 88 L. Ed. 2d 435, 106 S. Ct. 466 (1985); **Small v. Secretary of Health and Human Services**, 892 F.2d 15, 16 (2d Cir. 1989) (**per curiam**); 28 U.S.C. §

636(b)(1) (West Supp. 1995); Fed. R. Civ. P. 72, 6(a), 6(e).

**DATED: September 2, 1997**
**New York, New York**

**Respectfully Submitted,**

**The Honorable Ronald L. Ellis**

**United States Magistrate Judge**

Only the Westlaw citation is currently available.

United States District Court,
D. Connecticut.
DIRECTV, INC., Plaintiff,
v.
Brendan GETCHEL, Defendant.
No. 3:03 CV 2073(GLG).
May 26, 2004.

Wayne D. Lonstein, Lonstein Law Office, Ellenville, NY, for Plaintiff.

*MEMORANDUM DECISION*

GOETTEL, J.

**\*1** On March 25, 2004, this Court granted Plaintiff's Motion for Default Judgment against Defendant, Brendan Getchel, who was alleged to have utilized a "pirate" cable television decoding device at his home to intercept DIRECTV's programming services without authority and without payment to DIRECTV. DIRECTV alleged that Getchel purchased this device and related equipment on April 6, 2001, from a Canadian company by using interstate or foreign wire facilities. It further alleged that Getchel's conduct has deprived it of subscription and pay-for-view revenues, has compromised its security and accounting systems, and infringed its trade secrets and proprietary information, and has interfered with its contractual and prospective business relations.

DIRECTV sets forth three substantive claims in its complaint: (1) Getchel's unauthorized reception of satellite signals in violation of the Federal Communications Act of 1934, as amended, 47 U.S.C. § 605(a); (2) his unauthorized interception of electronic communications in violation of the Electronic Communications Privacy Act, 18 U.S.C. § 2511(1)(a) and/or § 2511(1)(b); and (3) his possession of a pirate access device in violation of 18 U.S.C. § 2512(1)(b). The Motion for Default Judgment, however, seeks damages only on the Communications Act claim. [FN1] (Pl.'s Mot. and Affirmation in Support of Default at ¶ 11; Pl.'s Mem. in Support of Default Judgment at 5; Pl.'s Mem. of Law in Support of Request for Damages at 5. [FN2])

FN1. We note that in two cases factually similar to the instant case, the courts declined to award damages under 18 U.S.C. § 2520(c)(2) (providing for actual damages or statutory damages of $100 a day for each day of violation or $10,000, whichever is greater) where there was

no evidence as to how many days the defendant used the pirate access device or that the defendant had profited significantly from his violations or induced others to engage in similar conduct. *See DIRECTV, Inc. v. Kaas,* 294 F.Supp.2d 1044, 1048-49 (N.D.Iowa 2003); *DIRECTV, Inc. v. Perrier,* No. 03-CV-400S, 2004 WL 941641, at \*4 (S.D.N.Y. Mar. 15, 2004); *but see DIRECTV, Inc. v. Braun,* No. 3:03CV937, 2004 WL 288805, at \*1 (D.Conn. Feb.9, 2004) (awarding $10,000 in damages under § 2520(c)(2)(B), although, in that case, there were no damages claimed under 47 U.S.C. § 605(e)(3)(C)(i), as in the instant case). In *Kaas* and *Perrier,* however, the courts awarded damages under 47 U.S.C. § 605(e)(3)(C)(i). In the instant case, there is no evidence concerning Getchel's actual use of the pirated device or that he profited from it, except avoiding subscription charges with DIRECTV. Therefore, we only award damages under 47 U.S.C. § 605(e)(3)(C)(i).

FN2. At the request of the Court, DIRECTV submitted a memorandum on damages, which was served on Getchel. No response has been filed by Getchel.

*Discussion*

Because a default has been entered, the allegations of the complaint that establish Getchel's liability are accepted as true. *See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.,* 973 F.2d 155, 158 (2d Cir.1992), *cert. denied,* 506 U.S. 1080, 113 S.Ct. 1049, 122 L.Ed.2d 357 (1993); Fed.R.Civ.P. 8(d). Damages, however, must be established by proof, unless the damages are liquidated or "susceptible of mathematical computation," *Flaks v. Koegel,* 504 F.2d 702, 707 (2d Cir.1974), which these are not. A hearing on damages is not required as long as the Court ensures that there is a basis for the damages awarded. *See Transatlantic Marine Claims Agency, Inc. v. Ace Shipping Corp.,* 109 F.3d 105, 111 (2d Cir.1997); *see generally Cablevision of Southern Conn., Ltd. P'ship v. Smith,* 141 F.Supp.2d 277, 281- 82 (D.Conn.2001).

Based on the allegations of the complaint, which are deemed admitted, the Court finds that Getchel has violated the Communications Act, 47 U.S.C. § 605(a), [FN3] by virtue of his receipt of DIRECTV's satellite transmissions of television programming without authorization. *See International Cablevision, Inc. v. Sykes,* 75 F.3d 123, 133 (2d Cir.), *cert. denied,* 519 U.S. 929, 117 S.Ct. 298, 136 L.Ed.2d 217 (1996) (holding that an individual's use of a "pirate" cable television descrambling device to intercept without authorization programming services transmitted via satellite constituted a violation of § 605(a)). The Court may reasonably conclude that Getchel purchased the device in order to pirate DIRECTV's transmissions. There is no legitimate purpose for the unlooper device purchased by Getchel. (Aff. of Stanley F. McGinnis at ¶ 17.) *See also Time Warner Cable of New York City v. Barbosa,* No. 98 CIV. 3522, 2001 WL 180366, at *3 (S.D.N.Y. Jan.2, 2001) (finding that there is "no legitimate function or purpose … for a converter-decoder…. Such a device is only capable of enabling its user to receive unauthorized television programming without having to make payment to a cable operator"). The unlooper device, working in conjunction with the satellite dish, satellite receiver, and other equipment that Getchel had in his possession, made it possible for Getchel to intercept and receive DIRECTV's signals without authorization. *See DIRECTV, Inc. v. Karpinsky,* 274 F.Supp.2d 918 (E.D.Mich.2003). Thus, the Court finds that Getchel has violated § 605(a).

FN3. Subsection (a) of 47 U.S.C. § 605 provides in part that "[n]o person not being entitled thereto shall receive … any interstate or foreign communication by radio and use such communication … for his own benefit…."

*\*2* This leaves the issue of damages. DIRECTV has sought statutory damages pursuant to 47 U.S.C. § 605(e)(3)(C)(i) as well as injunctive relief, prejudgment interest, and litigation costs. Under 47 U.S.C. § 605(e)(3)(C)(i), damages are to be computed, "at the election of the aggrieved party," in accordance with any of the following:
(I) actual damages suffered by the aggrieved party as a result of the violation and any profits of the violator; or
(II) statutory damages for each violation of subsection (a) in a sum of not less than $1,000 or more than $10,000, as the court considers just, and, for each violation of paragraph (4) [FN4] of this subsection, statutory damages in a sum of not less than $10,000, or more than $100,000, as the court considers just.

FN4. Paragraph (4) of 47 U.S.C. § 605(e) provides criminal penalties for "[a]ny person who manufactures, assembles, modifies, imports, exports, sells, or distributes any electronic, mechanical, or other device or equipment, knowing or having reason to know that the device or equipment is primarily of assistance in the unauthorized decryption of satellite cable programming, or direct-to-home satellite services." It further provides that "the prohibited activity established herein as it applies to each such device shall be deemed a separate violation." *Id.*

DIRECTV has elected to seek statutory damages, as opposed to actual damages, and asks the Court to award $10,000 for Getchel's violation of subsection (a) and $100,000 for Getchel's violation of paragraph (4).

The award of damages under § 605(e)(3)(C)(i) is committed to the Court's sound discretion. *Cablevision of Southern Connecticut,* 141 F.Supp.2d at 286. Courts have used a variety of methods to calculate damages under § 605, including (1) assessing the maximum statutory rate; (2) estimating the amount of services the defendant pirated and applying a multiplier to that figure; (3) adopting the plaintiff's estimate of the amount of services pirated; and (4) where there has been no evidence of the plaintiff's actual usage or commercial advantage, applying the statutory minimum for each pirated device. *See CSC Holdings, Inc. v. Ruccolo,* 01 Civ. 5162, 2001 WL 1658237, at *2 (S.D.N.Y. Dec.21, 2001) (collecting cases); *DIRECTV, Inc. v. Kaas,* 294 F.Supp.2d at 1048 (awarding damages of $1,000 under § 605(e)(3)(C)(i) where the complaint alleged that the defendant had purchased a single pirate access device); *DIRECTV, Inc. v. Hamilton,* 215 F.R.D. 460, 462 (S.D.N.Y.2003) (awarding damages of $2,000 under § 605(e)(3)(C)(i) where one defendant had purchased two pirate access devices and declining to award the maximum statutory damages where the plaintiff had failed to proffer any justification for such an award); *DIRECTV, Inc. v. Perrier,* No. 03-CV-400S, 2004 WL 941641, at *3 (W.D.N.Y. Mar.15, 2004) (awarding $2,000 in damages under § 605(e)(3)(C)(i) where the complaint alleged that the defendant had purchased two pirate access devices). "**In its broad discretion for determining statutory damages, the district court should consider both the willfulness of the defendant's conduct and the deterrent value of the sanction imposed.**" *Cable/Home Communications Corp. v. Network Productions, Inc.,* 902 F.2d 829, 852 (11th Cir.1990).

DIRECTV has alleged and produced evidence that Getchel purchased one pirate access device for use at his home in connection with the satellite equipment he already possessed. There is no claim that he used this commercially or that he purchased the device for resale. Although DIRECTV seeks the maximum statutory penalty of $10,000 per violation, the Court declines to award the maximum amount in light of the fact that there is no evidence concerning Getchel's commercial use of the device or the amount of his actual usage of the device. Following the lead of several courts cited above, the Court awards $1,000 for Getchel's violation of § 605(a) by virtue of his purchase and usage of the device.

*\*3* Additionally, in light of the fact that Getchel has owned this device since March of 2001 and has been able to avoid paying subscription fees to DIRECTV for a period of 38 months, an award of $1,000 would have no deterrent effect, since this is substantially less than what Getchel would have paid for the satellite programming had he received it in an authorized manner. DIRECTV has produced evidence that during the time Getchel actually subscribed to DIRECTV, the cost of his monthly subscription service was approximately $100, although this does not include pay-per-view programming, which was additional. Thus, the Court in its discretion awards additional damages of $3,800, for a total damage award of $4,800. *See Time Warner Cable of New York v. Barbosa,* 2001 WL 118608, at * 5 (holding that the statutory goals are served by taking into account the duration of the violation and awarding damages based on the plaintiff's lost revenues during this time period times a multiplier).

DIRECTV also seeks an award of damages of $100,000 under 47 U.S.C. § 605(e)(3)(C)(i)(II) for Getchel's violation of subparagraph (4) of that section. *See* Note 4, *supra.* We have two problems with this request. First, DIRECTV did not allege a violation of subparagraph (4) in Count One of its complaint. The only mention of subparagraph (4) is in the prayer for relief. While it could be argued that Getchel's alleged purchasing of the device from a Canadian company constituted "importing" the device under subparagraph (4), it is not clear that Getchel was actually involved in the importing of the device. Plaintiff has produced an invoice for an "MK2 UNLOOPER-SU2," showing the client as Canadian Security and Technology and the contact as Getchel in Waterbury, Connecticut. There is no address for Canadian Security and the attached documentation shows the "Chain/Dealer" as Circuit City Superstore. Thus, it is not clear

whether Getchel purchased this device locally or whether he imported it from Canada. There is no other alleged conduct by Getchel that is encompassed by subparagraph (4). Subparagraph (4) is addressed to persons who "manufacture, assemble, modify, import, export, sell, or distribute" an electronic device knowing or having reason to know that the device is used for the unauthorized decryption of satellite cable programming. It imposes criminal penalties for such conduct, as well as civil penalties, which are ten times the civil penalties for a violation of subsection (a). *See* 47 U.S.C. § 605(e)(3)(C)(i)(II). At least one court has held that a "reasonable reading of this provision demonstrates that § 605(e)(4) targets upstream manufacturers and distributors, not the ultimate consumer of pirating devices, such as Defendant." *DIRECTV, Inc. v. Albright,* No. Civ. A. 03-4603, 2003 WL 22956416, at *2 (E.D.Pa. Dec.9, 2003). Accordingly, we decline to award damages under 47 U.S .C. § 605(e)(3)(C)(i)(II) for a violation of subparagraph (4).

*\*4* DIRECTV has also asked for prejudgment interest, but as the court held in *DIRECTV, Inc. v. Albright,* 2003 WL 22956416, at *4, there is no statutory basis in § 605 for such an award.

The Court further finds that DIRECTV is entitled to a permanent injunction enjoining and restraining Getchel from importing, receiving, possessing, or using a pirate access device, and hereby directs Getchel to surrender all pirate access devices in his possession to DIRECTV. 47 U.S.C. § 605(e)(3)(B)(i) (authorizing the Court to grant temporary and final injunctions on such terms as it deems reasonable to prevent or restrain violations of subsection (a)); *see DIRECTV, Inc. v. Kaas,* 294 F.Supp.2d at 1049.

Last, DIRECTV seeks an award of litigation costs in the amount of $150.00 for filing fees and $90.00 for service of process fees, for a total of $240.00. These costs have been documented and are reasonable. 47 U.S.C. § 605(e)(3)(B)(iii) (allowing the recovery of full costs to an aggrieved party who prevails); *Community Television Systems, Inc. v. Caruso,* 284 F.3d 430, 434 n. 5 (2d Cir.2004) (holding that § 605 requires the court to award reasonable attorney's fees); *see Cablevision of Southern Connecticut,* 141 F.Supp.2d at 288 (awarding fees); *DIRECTV, Inc. v. Perrier,* 2004 WL 941641, at *4 (awarding fees). DIRECTV has provided no other evidence or documentation supporting its request for attorney's fees.

*Conclusion*

Accordingly, the Court awards damages of $4,800.00, and litigation costs of $240.00 in favor of Plaintiff, DIRECTV, Inc., and against Defendant, Brendan Getchel. The Court further permanently enjoins and restrains Defendant Getchel from importing, receiving, possessing, or using a pirate access device, and further directs Defendant Getchel to surrender to Plaintiff DIRECTV all pirate access devices in his possession.

The Clerk shall enter Judgment in accordance with this decision.

SO ORDERED.

D.Conn.,2004.

DIRECTV, Inc. v. Getchel

2004 WL 1202717 (D.Conn.)

Motions, Pleadings and Filings (Back to top)

• 3:03CV02073 (Docket) (Dec. 02, 2003)

END OF DOCUMENT

Copr. (C) 2004 West. No Claim to Orig. U.S. Govt. Works.

2004 WL 1490307 (S.D.N.Y.)
Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
CABLEVISION SYSTEMS NEW YORK CITY CORPORATION, Plaintiff,
v.
Catherine COLLINS, Defendant.
No. 01 Civ.10954 RO FM.
June 29, 2004.

*REPORT AND RECOMMENDATION TO THE HONORABLE RICHARD OWEN [FN*]*

FN* This Report and Recommendation was prepared with the assistance of Heather
Burke, a first-year student at Fordham Law School.

MAAS, Magistrate J.
I. *Introduction*
*1 In this action, plaintiff Cablevision Systems New York ("Cablevision") alleges that
defendant Catherine Collins ("Collins") violated the Cable Communications Policy Act, as
amended, 47 U.S.C. §§ 605(a) and 553(a)(1), by tampering with Cablevision's television
system in order to receive its private telecommunications signals unlawfully through use
of a "pirate" converter device. After Collins failed to answer the complaint, Your Honor
entered a default judgment and referred the matter to me to conduct an inquest
regarding Cablevision's damages. (*See* Docket No. 4).
On August 27, 2002, I directed Cablevision to serve and file an inquest memorandum by
September 4, 2002, setting forth its proof of damages, as well as its proposed findings of
fact and conclusions of law. The scheduling order gave Collins until September 18, 2002,
to respond. Although Cablevision's papers were timely filed, Collins has neither filed any
opposition papers, nor had any contact with this Court.
As detailed below, I recommend that Cablevision be awarded a total of $10,690,
consisting of statutory damages in the amount of $10,000 plus reasonable attorneys' fees
and costs in the amount of $690.
II. *Standard of Review*
In light of Collins' default, Cablevision's well-pleaded allegations concerning issues other
than damages must be accepted as true. *See Cotton v. Slone, 4 F.3d 176, 181 (2d
Cir.1993); Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp., 973 F.2d 155, 158 (2d
Cir.1992); Time Warner Cable of New York City v. Barnes, 13 F.Supp.2d 543, 547
(S.D.N.Y.1998); Cablevision Sys. New York City Corp. v. Lokshin, 980 F.Supp. 107, 111
(E.D.N.Y.1997).*
Additionally, although a plaintiff seeking to recover damages against a defaulting
defendant must prove its claim through the submission of evidence, the Court need not
hold a hearing as long as (i) it has determined the proper rule for calculating damages,
*see Credit Lyonnais Secs. (USA), Inc. v. Alcantara, 183 F.3d 151, 155 (2d Cir.1999),* and
(ii) the plaintiff's evidence establishes, with reasonable certainty, the basis for the
damages specified in the default judgment. *See Transatlantic Marine Claims Agency, Inc.
v. Ace Shipping Corp., 109 F.3d 105, 111 (2d Cir.1997); Fustok v. ContiCommodity
Servs., Inc., 873 F.2d 38, 40 (2d Cir.1989); see also Tamarin v. Adam Caterers, Inc., 13
F.3d 51, 53-54 (2d Cir.1993)* (inquest on damages without hearing improper where
based upon "single affidavit only partially based upon real numbers").
III. *Factual Findings*
On the basis of the complaint and Cablevision's inquest papers, I find as follows:
Cablevision is a division of CSC Holdings, Inc., a Delaware corporation, authorized to
conduct business in New York, which maintains its principal office at 1111 Stewart
Avenue, Bethpage, New York. (Compl.¶ 4).

Collins, at all relevant times, resided at 2440 Boston Road, Apt. 17K, Bronx, New York. (*Id.* ¶ 4; Aff. of Charles Carroll, sworn to on Aug. 28, 2002 ("Carroll Aff."), ¶ 18).

 *2 Pursuant to government franchises, Cablevision constructs, operates and maintains cable television systems in parts of Bronx County as well as other counties. (Compl.¶ 6). Cablevision offers its customers various tiers of programming services including "Basic," "Family," and "Optimum" which a subscriber may purchase for a monthly fee. (*Id.* ¶ 7). "Basic" service provides a subscriber with broadcast stations as well as a small number of additional programming services. (Carroll Aff. ¶ 3). "Family" service is a higher level of programming that includes all of Cablevision's services with the exception of "premium" and pay-per-view programming. (*Id.*). "Optimum" service provides all programming available under "Family" service and premium stations. (*Id.*). A subscriber may pay for premium services at a higher monthly rate, or may choose to purchase pay-per-view programming for a pay-per-event fee in addition to the regular monthly fee. (*Id.* ¶¶ 4-5). Premium services include channels such as HBO, Cinemax and Showtime, and range in price from approximately $1.95 to $14.95 per month, while packages of premium services range in cost between $40.75 and $80.95. (*Id.* ¶ 4). Pay-per-view programming is offered continuously throughout a 24-hour period and consists of individual movies and sporting events. (*Id.* ¶ 5). The pay-per-view items typically cost a subscriber between approximately $4.50 and $49.95 per selection. (*Id.*). Over the course of a typical month, the aggregate value of Cablevision's pay-per-view programs, assuming each is viewed once, is hundreds of dollars. (*Id.*).

Satellites transmit the signals for Cablevision's cable television services to Cablevision's reception facilities. (Compl.¶ 10). Those signals then are retransmitted to subscriber's homes and businesses through a network of cable wiring and equipment. (*Id.*).

Each subscriber is entitled to receive only the level of programming and services that the subscriber has specifically selected and purchased. (Carroll Aff. ¶ 7). The signals of that specific programming are encoded or "scrambled" to prevent subscribers from receiving programming for which they have not paid. (*Id.* ¶ 9). Cablevision provides each subscriber with a converter-decoder box which is programmed by Cablevision to decode only the services and programs that the subscriber has purchased. (*Id.* ¶¶ 8, 10). Scrambled programming which has not been purchased remains distorted and unviewable. (*Id.*).

Despite this scrambling technology, a pirate converter-decoder can "descramble" Cablevision's signals so that the programming can be seen without paying first. (Compl.¶ 14). After commencing an action against Mega Electronics ("Mega") for the sale and distribution of such pirate converter-decoder devices, Cablevision obtained records regarding the sale and shipment of Mega's devices to purchasers across the country. (Carroll Aff. ¶¶ 15-17). The records show that, on July 21, 1999, Collins purchased two pirate converter-decoders from Mega. (*Id.* ¶ 19 & Ex. C). The decoders purchased by Collins can be used to defeat the encryption technology used by Cablevision in the Bronx. (*Id.* ¶ 20).

 *3 Collins first subscribed to Cablevision's services on January 10, 1997. (*Id.* ¶ 18). In August 1999, one month after purchasing the pirate Mega converters, Collins downgraded her services from "Optimum Gold" to "Family" level. (*Id.* ¶ 18). In March 2001, Collins added HBO, which she later removed in August 2001. Collins upgraded her service to the "Optimum" level in October 2001, but later downgraded to the "Family" level in January 2002. (*Id.*). At the time of the default judgment, Collins subscribed to the "Family" level of service at a cost of $35 per month. (*Id* .).

For the foregoing services Collins paid Cablevision approximately $35 per month from August 1999 to March 2001 (approximately 19 months), $46.95 per month from March 2001 to August 2001 (approximately 5 months), [FN1] $35 per month from August 2001 to October 2001 (approximately 2 months), $80 per month from October 2001 to January 2002 (approximately 3 months) [FN2] and $35 per month from January 2002 to July 2002 (approximately 6 months). Therefore, after her purchase of the pirate boxes through the date of the default judgment, Collins paid Cablevision a total of $1,419.75 (($35 x 27 months) + ($46.95 x 5 months) + ($80 x 3 months)).

FN1. Cablevision offered premium services such as HBO at an average price of $11.95 for each premium channel. (Carroll Aff. ¶ 24). I have accordingly assumed that her monthly bill during this period was $46.95 ($35 + $11.95).

FN2. Cablevision's papers do not indicate the cost of an "Optimum" level of service. However, the price of "Family" service plus all premium services is approximately $80 per month. (Carroll Aff. ¶ 24).

IV. *Discussion*
A. *Statutory Damages*
Sections 553 and 605 of Title 47 of the United States Code prohibit the unauthorized interception and reception of cable programming services. [FN3] *Barnes,* 13 F.Supp.2d at 547-48 (citing *Int'l Cablevision, Inc. v. Sykes,* 75 F.3d 123, 133 (2d Cir.1996)); *Lokshin,* 980 F.Supp. at 112 ("In contrast to Section 553, which by its statutory language applies only to transmissions via cable systems, Section 605(a) applies to the 'interception of cable-borne, as well as over-the-air, pay television' where cable-borne transmissions originate as satellite transmissions.... Thus, when pay television programming is transmitted over both cable and satellite mediums, both statutes apply." (quoting *Sykes,* 75 F.3d at 130)).

FN3. Section 553(a)(1) provides, in part, that:

No person shall intercept or receive ... any communications service offered over a cable system unless specifically authorized to do so by a cable operator or as may otherwise specifically authorized by law.

Section 605(a) provides, in part, that:

No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect or meaning of such intercepted communication to any person.

When a court determines that a defendant has violated both Sections 553 and 605, the aggrieved cable operator may recover damages under only one of those sections. *Sykes,* 75 F.3d at 127; *Barnes,* 13 F.Supp.2d. at 548; *American Cablevision of Queens v. McGinn,* 817 F.Supp. 317, 320 (E.D.N.Y.1993). A plaintiff may, however, elect to recover damages under Section 605 in consideration of its higher damages award. *Sykes,* 75 F.3d at 127; *Barnes,* 13 F.Supp.2d at 548.
In this case, Collins purchased two descrambling devices capable of intercepting and receiving encrypted Cablevision signals. Moreover, it is apparent that she used them since she lowered her level of Cablevision service shortly after the purchase. Cablevision holds proprietary rights in the transmissions that Collins has intercepted and, therefore, is a "person aggrieved" within the meaning of 47 U.S.C. §§ 553(c)(1) and 605(e)(3)(A).
*\*4* Cablevision has elected to recover statutory damages under Section 605. (Carroll Aff. ¶ 29). Section 605(e)(C)(3)(ii) provides that the aggrieved party may recover no less than $1,000 and no more than $10,000 for each violation "as the court considers just." Not surprisingly, Cablevision seeks to recover the statutory maximum with respect to each Mega device, for a total of $20,000. (*Id.*).
Because the statute offers little guidance as to how to calculate damages, courts in this circuit have adopted two approaches to assessing damages in cases of unauthorized descrambling of signals by residential subscribers.
One approach has been to assess damages based on the difference between the amount of service for which defendants paid monthly and the amount their unauthorized use

enabled them to receive over the course of their misconduct. *See Lokshin,* 980 F.Supp. at 113 (finding award of $125 per month for pilfered pay-per-view services to be reasonable); *McGinn,* **817 F.Supp. at 320** (imposing statutory damages of $250 per month per unauthorized decoder); *Time Warner Cable of N.Y. v. Rivera,* No. 94 Civ. 2339, 1995 WL 362429, at * 4 (E.D.N.Y. June 8, 1995) (Report & Rec. of Mag. J. Gold) (recommending approximately $1,000 in damages for eight months of pay-per-view programming); *Time Warner Cable of N.Y. v. Fland,* No. 97 Civ. 7197, 1999 WL 1489144, at * 4 (S.D.N.Y. Dec. 3, 1999) (Report & Rec. of Mag. J. Grubin) ($71.55 per month in unpaid premium services and $225 per month in pay-per-view services); *Cablevision Sys. New York City Corp. v. Santiago,* No. 02 Civ. 322, 2003 WL 1882254, at *5-*6 (S.D.N.Y. Mar. 17, 2003) (Report & Rec. of Mag. J. Freeman) ($45 per month in unpaid premium services and $110 per month in pay-per-view services). Other courts have awarded a flat sum based only on the court's determination of the appropriate damages given the circumstances of the case. *Barnes,* 13 F.Supp.2d at 548 (awarding a $1,000 flat sum); *Time Warner Cable of N.Y.C. v. Domsky,* No. 96 Civ. 6851, 1997 WL 33374593, at *6-*7 (S.D.N.Y. Sept. 2, 1997) ($1,000 in statutory damages per violation).

Although Collins' failure to submit any evidence makes it impossible to determine the actual period during which Collins was using at least one of her pirate decoders, it is reasonable to assume that she began using them within one month after her purchase when she downgraded her level of cable service. In the absence of any showing to the contrary, it is also reasonable to assume that she continued to use the pirate devices through the date of the default judgment, despite the various changes in her level of service. During that 35- month period the cost of obtaining all of Cablevision's premium services was approximately $80 per month. (Carroll Aff. ¶ 24). Collins should therefore have likely paid $2,800 ($80 x 35 months) for such services had she not used the unauthorized devices. During that period, however, Collins paid Cablevision only $1,419.75. Thus, if one assumes that Collins used her decoder boxes in this fashion, Cablevision's loss due to her unauthorized access of all its premium programming other than pay-per-view is approximately $1,380.25 ($2,800--$1,419.75).

 *5 Estimating the amount of unauthorized pay-per-view programming which Collins received is somewhat more difficult. Cablevision claims that the aggregate value of each individual pay-per-view program offered over a typical month, is hundreds of dollars. (Carroll Aff. ¶ 5). Other courts in similar circumstances have estimated the revenue that a cable operator lost with respect to pay-per-view programming, based upon a reasonable assumption as to the number of high-cost and low-cost events the defendant likely watched each month. *See, e.g., Lokshin,* 980 F.Supp. at 113 ($125 in pay-per-view services per month based on an estimate of 16 selections priced at $5 each and four selections at an average cost of $11.25); *see also Fland,* 1999 WL 1489144, at *4 (estimating $225 in pay-per-view services each month without explaining the breakdown of that estimate). Consistent with these decisions, it is reasonable to assume that Collins would not have purchased each pay-per-view program every time it was shown, but, rather, would have watched at least three minimum-cost events per month plus one maximum-cost event. This would have resulted in an additional loss to Cablevision of $63.45 per month (($4.50 x 3) + $49.95) or $2,220.75 from August 1999 to July 2002 ($63.45 x 35 months).

The overall loss to Cablevision due to Collins' unauthorized access, is therefore approximately $3,601 ($1380.25 + $2220.75). However, as Magistrate Judge Ellis noted in *Domsky,* 1997 WL 33374593, at *6, awarding damages simply for the value of the services stolen by a defendant "would not be sufficient deterrence" since the penalty would merely be "the amount that should have been paid." Accordingly, it is appropriate to double the monthly damages for each month that Collins was likely using her illegal decoders. *Cablevision Sys. N.Y.C. Corp. v. Sencion,* No. 01 Civ. 7069, 2001 WL 1586685, at *3 (S.D.N.Y. Dec. 12, 2001) (Stein, J.); *Domsky,* 1997 WL 33374593, at *6. This would result in an award of statutory damages in the amount of $7,202.

Finally, in this case, Collins purchased two pirate decoders. Due to her default, it is unclear whether Collins used both decoders at her home or gave the second one to

another Cablevision subscriber. In these circumstances, it is appropriate to increase the statutory damages awarded, but doubling them seems unduly harsh. Instead, I recommend that the amount of statutory damages be increased to $10,000 (the statutory maximum for one infringing device).

B. *Attorneys' Fees*

Cablevision also seeks attorneys' fees and costs in the amount of $1,565. (*See* Affirm, of William, E. Primavera, Esq., dated Aug. 30, 2002 ("Primavera Affirm."), ¶ 13). As the prevailing aggrieved party, Cablevision is entitled to recover reasonable attorneys' fees and costs. 47 U.S.C. § 605(e)(3)(B)(iii). When fixing a reasonable rate for attorneys' fees, courts may consider and apply prevailing market rates "for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Gierlinger v. Gleason,* 160 F.3d 858, 882 (2d Cir.1998) (quoting *Blum v. Stenson,* 465 U.S. 886, 895 n. 11 (1984)). Moreover, a court may rely on its own knowledge of private firm hourly rates in estimating reasonable attorneys' fees. *Miele v. New York State Teamsters Cong. Pension & Ret. Fund,* 831 F.2d 407, 409 (2d Cir.1987).

**\*6** In the Second Circuit, a party seeking an award of attorneys' fees must support that request with contemporaneous time records that show, "for each attorney, the date, the hours expended, and the nature of the work done." *New York State Ass'n for Retarded Children, Inc. v. Carey,* 711 F.2d 1136, 1154 (2d Cir.1983). Attorneys' fees applications that do not contain such supporting data "should normally be disallowed." *Id.* at 1154; *see also Kingvision Pay-Per-View v. The Body Shop,* No. 00 Civ. 1089, 2002 WL 393091, at \*5 (S.D.N.Y. Mar. 13, 2002) (Swain, J.) (denying award of attorneys' fees where information regarding how the fees were accumulated was not provided even though requested amount of $1,000 was reasonable).

In prosecuting this action, Cablevision availed itself of the services of William E. Primavera an associate with Lefkowitz, Louis & Sullivan, LLP. Primavera has submitted an affirmation setting forth (a) his professional experience; (b) the professional experience of the paralegals and legal assistants who worked with him; (c) the prearranged fees that Cablevision actually paid his employer for the work performed; and (d) the billing rate at which Cablevision seeks to be compensated. (Primavera Affirm. ¶¶ 2-13). The billing rates for each of the timekeepers seem more than reasonable. Nevertheless, as I have indicated previously, (*see Cablevision Sys. New York City Corp. v. Diaz,* No. 01 Civ. 4340, 2002 WL 31045855, at \*4 (S.D.N.Y. July 10, 2002)), Cablevision is not entitled to be compensated for its lawyer's flat-rate billing.

In this case, Primavera has provided time sheets prepared by the timekeepers who worked on this matter. (*Id.* Exs. D-H.). Two of the time sheets do not reflect the actual hours expended, (*see id.* Exs. D, H), and must be disallowed. *See Santiago,* 2003 WL 1882254, at \*7 (denying request for attorneys' fees where plaintiff sought legal fees based on flat-rate billing for certain work, but did not provide the number of hours expended).

The time records of the Lefkowitz firm which reflect actual hours expended relate to the work performed by four paralegals, each of whom has an $85 per hour billing rate. Those records indicate that Susan A. Weindler spent 0.3 hours (*see* Primavera Affirm. ¶ 10 & Ex. F); Alfonso N. Cava spent 0.4 hours (*see id.* ¶ 11 & Ex. G); Jeanine D. Colavito spent 0.3 hours (*see id.* ¶ 11 & Ex. H); and Janine P. Zabbia spent 5 hours working on this case. (*See id.* ¶ 9 & Ex. E). Accordingly, Cablevision is entitled to recover $510 for the legal services rendered by the Lefkowitz firm. ($85 x 6 hours).

C. *Costs*

Cablevision also seeks to recover $180 in costs, consisting of $30 for service of process and the $150 filing fee. This request is reasonable and should be allowed.

IV. *Conclusion*

For the reasons set forth above, I recommend that Cablevision be awarded damages in the amount of $10,690, consisting of $10,000 in statutory damages, $510 for attorneys' fees, and $180 for costs.

V. *Notice of Procedure for Filing of Objections to this Report and Recommendation*

**\*7** The parties are hereby directed that if they have any objections to this Report and

Recommendation, they must, within ten (10) days from today, make them in writing, file them with the Clerk of the Court, and send copies to the chambers of the Honorable Richard Owen, United States District Judge, 40 Centre Street, New York, New York 10007, and to the chambers of the undersigned, at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Owen. Any failure to file timely objections will result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir.1992); 28 U .S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72(b).

S.D.N.Y.,2004.

Cablevision Systems New York City Corp. v. Collins

2004 WL 1490307 (S.D.N.Y.)

END OF DOCUMENT

Copr. (C) 2004 West. No Claim to Orig. U.S. Govt. Works.